**THIRD DIVISION**
**MILLER, P. J.,**
**RAY and BRANCH, JJ.**

NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
(Court of Appeals Rule 4 (b) and Rule 37 (b), February 21, 2008)
http://www.gaappeals.us/rules/

**November 20, 2012**

# In the Court of Appeals of Georgia

A12A0891. CARSON v. OBOR HOLDING COMPANY, LLC.

BRANCH, Judge.

Alan Carson is a member of Obor Holding Co., LLC, and a former employee of its wholly-owned subsidiary, Obor Digital, LLC. After Obor Digital significantly reduced his compensation, Carson claimed he had been constructively discharged from Obor Digital, resigned from the Management Committee of Obor Holding, and filed suit against Obor Holding, seeking to enjoin it from enforcing against him the restrictive covenants contained in the current Obor Holding Operating Agreement. Obor Holding moved to dismiss Carson's complaint based upon the forum selection clause contained in the Operating Agreement, which provides that any disputes arising out of the Operating Agreement will be litigated in Florida. Carson opposed the motion to dismiss, arguing that the trial court should find the forum selection clause

unenforceable because allowing a Florida court to decide the enforceability of the non-compete agreements would violate of Georgia's public policy, as that policy existed at the time he executed the Operating Agreement.[1] In support of this claim, Carson pointed to the fact that the forum selection clause also contained a choice of law provision requiring the application of Florida law to any disputes between the parties. The court below granted the motion to dismiss and Carson now appeals from that order. Finding that the trial court erred when it found the Operating Agreement's forum selection clause enforceable in this case, we reverse.

When an appeal is taken from a dismissal based upon a contractual forum-selection clause, we owe no deference to the decision of the court below, and our review is de novo. *The Houseboat Store v. Chris-Craft Corp.*, 302 Ga. App. 795 (692 SE2d 61) (2010).

---

[1] The parties entered into the Operating Agreement prior to the November 2010 ratification of an amendment to the Constitution of Georgia that effected changes in Georgia law regarding restrictive covenants. As a result of that constitutional amendment, Georgia enacted new statutory provisions governing restrictive covenants in employment contracts. See OCGA § 13-8-50, et seq. However, Ga. L. 2011, Act 99, § 5 provides that the new law "shall not apply in actions determining the enforceability of restrictive covenants entered into before" the ratification of the constitutional amendment. Accordingly, we will "apply the law of restrictive covenants as it existed before [ratification]." *Cox v. Altus Healthcare & Hospice*, 308 Ga. App. 28, 30 (2) (706 SE2d 660) (2011).

The facts relevant to this appeal are undisputed, and show that Obor Holding is a Florida corporation formed in 2006 for the purpose of owning Obor Digital, a company that provides software and staffing services to clients in the defense industry. Obor Holding conducts business in Florida and Georgia. At all times relevant to this case, Carson has been a Georgia resident, having lived here since 1984. He executed Obor Holding's Amended and Restated Operating Agreement in February 2007, and that agreement became effective in July 2007.[2] Pursuant to the Operating Agreement, the business of Obor Holding is conducted by a four-person Management Committee, with each member of that committee being a Director of the company.[3] From February 2006 until his resignation on September 2, 2011, Carson served as a member of the Management Committee and therefore as a Director of Obor Holding. The Operating Agreement contains several restrictive covenants that apply only to the Directors of the company, including a covenant of nondisclosure, a

---

[2] The Operating Agreement reflects that Carson contributed $400,000 of the $1,472,060 in total capital contributed by Obor Holding's ten members. In return, he received 20,000 of the company's 110,000 units. This Operating Agreement contains the restrictive covenants at issue.

[3] Only four of Obor Holding's members serve as Directors at any one time.

nonsolicitation covenant, and a noncompete covenant.[4] The Operating Agreement also has a forum selection clause, which states that any legal actions brought for the purpose of "enforc[ing] any rights or obligations" thereunder "shall be [brought] in Orange County, Florida." The choice of law provision found in this clause states that the Operating Agreement shall be governed by Florida law.

In 2007, Carson went to work for Obor Digital as its Vice President of Sales.[5] In that capacity, Carson was originally responsible for the sales of, and training services related to, a specific software product. He later helped Obor Digital build a business providing technical staffing services to clients in the defense industry. According to Carson, he was constructively discharged from Obor Digital in April 2011, when the company unilaterally reduced his sales commissions. Since that time, Carson has worked to establish a consulting business providing business development and sales advice to companies in the defense industry. In September 2011, Carson

---

[4] The language of these covenants is set forth in full *infra*, in Division 1.

[5] The only written document evidencing any of the terms of Carson's employment with Obor Digital is a "Sales Compensation Policy," dated January 1, 2010, which states at the top that it was "issued for" Alan Carson. That document contains no restrictive covenants, and there is no evidence that Carson ever entered into a non-compete or non-solicitation agreement with Obor Digital. We assume for purposes of this appeal that the restrictive covenants contained in the Obor Holding Operating Agreement would apply to clients and prospects of Obor Digital.

4

resigned from Obor Holding's Management Committee, although he remains a member of Obor Holding. At or about the same time he resigned from the Management Committee, Carson filed the current action.

The issue before us is whether the forum selection clause contained in the Operating Agreement is enforceable against Carson. Because forum selection clauses involve procedural and not substantive rights,[6] we apply Georgia law to determine the enforceability of the clause here, even though it contains a choice of law provision requiring that the laws of Florida shall govern. *The Houseboat Store*, 302 Ga. App. at 797-798 (1) (b).

Contractual forum-selection clauses are "prima facie valid" and, therefore, presumptively enforceable. *OFC Capital v. Colonial Distrib.*, 285 Ga. App. 815, 817 (648 SE2d 140) (2007); see also *The Bremen v. Zapata Off-Shore Co.*, 407 U. S. 1 (92 SC 1907, 32 LE2d 513) (1972). Thus, the party seeking to avoid such a clause must show a compelling reason why it should not be enforced. See *SR Business Svcs. v. Bryant*, 267 Ga. App. 591, 592 (600 SE2d 610) (2004). Our prior cases establish that public policy may afford a compelling reason to avoid a forum-selection clause, *Iero*

---

[6] Under the rule of lex locus fori, procedural questions are governed by the law of the forum state. See *Bunker Hill Intl. v. NationsBuilder Ins. Svcs.*, 309 Ga. App. 503, 506 (710 SE2d 662) (2011).

*v. Mohawk Finishing Products*, 243 Ga. App. 670, 671 (534 SE2d 136) (2000), at least to the extent that proceedings in the selected forum are likely to produce a result that offends a settled public policy of Georgia, *Bunker Hill Intl.*, 309 Ga. App. at 506. During the relevant time period, one such settled public policy in Georgia was that certain agreements in partial restraint of trade, if unreasonable, were unenforceable. See *W. R. Grace & Co. v. Mouyal*, 262 Ga. 464, 465 (1) (422 SE2d 529) (1992). Consequently, we have held that if a party can show both that a restrictive covenant violates Georgia public policy and that a court in the selected forum likely would find the restrictive covenant enforceable, a compelling reason exists to avoid the contractual forum selection clause. *Bunker Hill*, 309 Ga. App. at 507. As discussed more fully below, we find that Carson has made the showing necessary to avoid the forum selection clause in this case.

1. Whether a restrictive covenant violates Georgia law depends upon whether the covenant can be considered a "reasonable" restraint on competition, given the circumstances of a particular case. Specifically, the restraint imposed must be reasonably limited and it must be "reasonably necessary to protect the interest of the party in whose favor it is imposed." (Citation omitted.) *W. R. Grace & Co.*, 262 Ga. at 465 (1). The issue of reasonableness represents a question of law for the court,

6

which should apply a three-part test, examining the duration, territorial coverage, and

scope of the activity prohibited by the covenant. Id. Additionally, the court should

consider "the nature and extent of the trade or business, the situation of the parties,

and all the other circumstances." (Citation and punctuation omitted.) Id. The test for

reasonableness is applied strictly in cases involving an employer-employee

relationship, while a lesser, mid-level degree of scrutiny is applied to restrictive

covenants contained in professional partnership or shareholder agreements.[7] *West*

*Coast Cambridge v. Rice*, 262 Ga. App. 106, 108 (1) (584 SE2d 696) (2003). In this

case, the parties devote a great deal of their argument to the issue of whether mid-level

or strict scrutiny applies to the restrictive covenants found in the Operating

Agreement. We find it unnecessary to decide this question, however, because even

---

[7] Covenants ancillary to a sale of business receive the least amount of scrutiny, and are subject to "blue-penciling," or reformation by the court so that they reflect the actual intent of the parties. See, e.g., *Watson v. Waffle House*, 253 Ga. 671-672 (2) (324 SE2d 175) (1985); *Paragon Technologies v. InfoSmart Technologies*, 312 Ga. App. 465, 467 (718 SE2d 357) (2011). This case does not involve the sale of a business.

under the lesser, mid-level scrutiny, the three restrictive covenants at issue violate

Georgia law.[8]

(a) The non-disclosure covenant found in the Operating Agreement provides:

Each of the Directors has access to confidential material and information belonging to the Company. . . . Each of the Directors acknowledges the importance of keeping all information confidential and shall not, while this Agreement remains in effect *and in perpetuity thereafter*, . . . use any confidential information for the benefit of any party other than the Company or disclose any confidential information to any person, firm, corporation, association or other entity for any reason or purpose whatsoever, other than the benefit of the Company.

(Emphasis supplied.)

The fact that this clause purports to bind Carson "in perpetuity," together with

its failure to define "confidential information," renders it overly broad and therefore

unenforceable under Georgia law. See *Cox*, 308 Ga. App. at 31 (2) (b) (finding

_____

[8] In its brief, Obor Holding argues that mid-level scrutiny allows us to "blue pencil," or reform, the restrictive covenants so that they comply with Georgia law. Obor Holding cites us to no authority for this proposition, however, and we are aware of none. Indeed, as indicated supra in note 7, the only time our Supreme Court has sanctioned the blue-penciling of restrictive covenants is where those covenants are found in a contract ancillary to the sale of a business. See, e.g., *Lyle v. Memar*, 259 Ga. 209 (378 SE2d 465) (1989)*; Watson*, 253 Ga. at 671-672 (2).

8

nondisclosure provisions "unenforceable on their face because they are not limited in time") (citation omitted) (citation and footnote omitted); *Onbrand Media v. Codex Consulting*, 301 Ga. App. 141, 144 (2) (a) (687 SE2d 168) (2009) (applying mid-level scrutiny and finding a restrictive covenant overly broad and unenforceable where, inter alia, it failed to define clearly the prohibited activity); *Pregler v. C & Z, Inc.*, 259 Ga. App. 149, 151 (2) (575 SE2d 915) (2003) ("[a] nondisclosure clause with no time limit is unenforceable as to information that is not a trade secret") (citation and footnote omitted); *Enron Capital & Trade Resources Corp. v. Pokalsky*, 227 Ga. App. 727, 730 (3) (490 SE2d 136) (1997) (same).

(b) The Operating Agreement's nonsolicitation covenant states:

> While he shall serve as a Director of the Company and for a period of twenty-four months after he shall cease for any reason to serve as a Director of the Company, each of the Directors shall not . . . solicit, seek *or accept business from*, interfere with or endeavor to entice away from the Company any Client or employee of the Company. For purposes hereof, the term "Client" shall mean any person or entity that (i) received service of any type from Company during the twenty-four month period immediately preceding the last day that the Director serves as a Director of the Company or (ii) has been contacted by the Company for the purpose of offering to provide Company services or products prior to the last day that the Director serves as a Director of the Company.

(Emphasis supplied.)

9

This clause violates Georgia law for at least two reasons. First, it forbids Carson from contacting any client or prospect of the company, regardless of whether Carson actually served those clients or prospects while he served as a Director of Obor Holding, but it contains no territorial restriction, a fatal flaw. "Georgia law is clear that unless the nonsolicit covenant pertains only to those clients with whom the employee had a business relationship during the term of the agreement, the nonsolicit covenant must contain a territorial restriction." (Citation and footnote omitted.) *Advance Technology Consultants v. Roadtrac*, 250 Ga. App. 317, 321 (3) (551 SE2d 735) (2001). See also *W.R. Grace & Co.*, 262 Ga. at 467 (2). And a nonsolicitation covenant that does not limit itself in such a fashion is invalid, even under reduced, mid-level scrutiny. See *Physician Specialists in Anesthesia v. MacNeill*, 246 Ga. App. 398, 406 (3) (b) (539 SE2d 216) (2000) (nonsolicitation covenant in partnership agreement that was not limited to patients with whom physician and former partner had previously had contact was overbroad and therefore invalid); *Habif, Arogeti & Wynne, P.C. v. Baggett*, 231 Ga. App. 289, 298 (3) (498 SE2d 346) (1998) (to be valid under mid-level scrutiny, a non-solicitation covenant must either contain a territorial restriction or limit itself to those clients for whom the former partner or shareholder "had done substantial work"); *New Atlanta Ear, Nose & Throat Assoc. v. Pratt*, 253 Ga. App. 681, 687 (2) (560 SE2d 268) (2002).

10

Second, this restrictive covenant is impermissibly overbroad because it bars Carson not only from soliciting any client or prospect of Obor Holding, but also from accepting any work from any such clients or prospects who initiate contact with Carson. Such a restraint violates Georgia public policy because it "unreasonably impacts" the restricted party's ability to make a living and the public's ability to choose the business or professional it prefers to contract with. (Citation omitted.) *Dougherty, McKinnon & Luby v. Greenwald, Denzik & Davis*, 213 Ga. App. 891, 894 (2) (b) (447 SE2d 94) (1994) See also *Roberts v. Tifton Med. Clinic*, 206 Ga. App. 612, 615 (426 SE2d 188) (1992) (noting that even under mid-level scrutiny, a court should consider whether a restrictive covenant works an "unnecessary harshness" against the party restrained) (citation and punctuation omitted); *Singer v. Habif, Arogeti, & Wynne*, 250 Ga. 376-377 (1) (297 SE2d 473) (1982); *Waldeck v. Curtis 1000, Inc.*, 261 Ga. App. 590, 592 (583 SE2d 266) (2003).

(c) The Operating Agreement also contains a covenant not to compete that provides:

> While he shall serve as a Director of the Company and for a period of twenty-four (24) months after he shall cease for any reason to serve as a Director of the Company, each of the Directors shall not, directly or indirectly (or through any affiliated entity), on his own behalf, or on

11

behalf of any other person or entity which provides or sells services or products in competition with those of the Company, do any of the following *within the United States of America*: (a) provide any service, support, product, technology (as an employee, licensor, consultant or otherwise), to any person or entity, if such service, support, product or technology involves or relates to, in any material respect, to services or products which compete with the Company's business (each, a "Restricted Business"), or (b) own, manage, operate, be employed by or a consultant to, join, control, finance, participate in the ownership, management, operation, control or financing of, or have any stock, equity or other interest in, either directly or indirectly, or have any right of compensation from, a company or other entity engaged in a Restricted Business.

(Emphasis supplied.)

In determining the reasonableness of a non-compete clause, we must consider both the interests of the party seeking to enforce the covenant and those of the party restricted by the covenant. Specifically, we must consider how the covenant impacts the restricted party's ability to earn a living and to determine with reasonable certainty both the nature of the activities that are restricted and the geographic area of the restriction. *W. R. Grace*, 262 Ga. at 465-466 (2); *Hulcher Svcs. v. R. J. Corman R. Co.*, 247 Ga. App. 486, 491-492 (4) (543 SE2d 461) (2000). See also *Onbrand Media*, 301 Ga. App. at 144 (2) (a) (applying mid-level scrutiny and considering both territorial

12

limits and the scope of the activity restricted to determine the enforceability of restrictive covenants); *Roberts*, 206 Ga. App. at 615. We must then balance these considerations against the company's business interests, including its interest in maintaining existing customer relationships established by the former partner, shareholder, or employee. *W. R. Grace*, 262 Ga. at 465-466 (2). See also *Habif, Arogeti & Wynne*, 231 Ga. App. at 294 (2) (c) (even under mid-level scrutiny "[t]he restricted activities must be reasonably related to the business interests the employer seeks to protect") (footnote omitted).

Here, the non-compete clause is prima facie unreasonable because by restricting activity in the entire country, it contains no legitimate territorial restriction. Specifically, it fails to limit Carson's restricted activities either to the geographic area in which he served Obor Holding clients or to the geographic area in which Obor Holding does business. See *Paramount Tax & Accounting v. H & R Block Eastern Enterprises*, 299 Ga. App. 596, 601 (1) (683 SE2d 141) (2009); *Hulcher Svcs.*, 247 Ga. App. at 491-492 (4); *New Atlanta Ear, Nose & Throat Assoc.*, 253 Ga. App. at 687 (2); *Habif, Arogeti & Wynne*, 231 Ga. App. at 293-294 (2) (b).

Moreover, the clause is overbroad because it effectively bars Carson from working in any capacity for, owning any interest in, or serving on the board of any

13

competitor of Obor Holding. See *Uni-Worth Enterprises v. Snider*, 244 Ga. 636, 639-640 (1) (261 SE2d 572) (1979) (restrictive covenants which prohibit a party from engaging in any business or activity that might compete with his former employer are too indefinite to be enforced); *Howard Schultz & Assoc. v. Broniec*, 239 Ga. 181, 184 (2) (236 SE2d 265) (1977) (covenants prohibiting an employee from working for "a competitor 'in any capacity' impose a greater limitation upon the employee than is necessary for the protection of the employer and therefore is unenforceable") (citations omitted); *Global Link Logistics v. Briles*, 296 Ga. App. 175, 178 (1) (c) (674 SE2d 52) (2009) ("A non-competition covenant which prohibits an employee from working for a competitor in any capacity, that is, a covenant which fails to specify with particularity the activities which the employee is prohibited from performing, is too broad and indefinite to be enforceable") (citation and punctuation omitted). Put another way, these restrictions are far broader than necessary to protect Obor Holding's legitimate business interests because the company has no legitimate business interest in not having to compete with Carson in any facet of the defense industry anywhere in the United States. *Hulcher Svcs.*, 247 Ga. App. at 492 (5).

Given its failure to limit either the scope of activities from which Carson is prohibited in engaging or the territory in which Carson is so restricted, the non-

14

compete clause is unreasonable and therefore unenforceable. See *Rash v. Toccoa Clinic Med. Assoc.*, 253 Ga. 322, 324 (1) (320 SE2d 170) (1984) (even under mid-level scrutiny, restrictions must be reasonable as to territory); *OnBrand Media v. Codex Consulting*, 301 Ga. App. 141, 146 (2) (a) (ii) (687 SE2d 168) (2009) (applying mid-level scrutiny and finding restrictive covenants unenforceable because they contained "no specific territorial limits nor any clear limits on the scope of the prohibited activity") (footnote omitted).

2. Having found that the covenants would be unenforceable under Georgia law, we now address whether Carson can show that a Florida court would nevertheless be likely to enforce the covenants, thereby necessitating intervention by Georgia courts. To make this showing, Carson must demonstrate that a Florida court likely would apply Florida law and that, under Florida law, the covenants likely would be enforceable. See *Iero*, 243 Ga. App. at 672; *Crump Ins. Svcs. v. All Risks, Ltd.*, 315 Ga. App. 490, 494 (727 SE2d 131) (2012) (Blackwell, J., concurring specially). Carson has made both of these showings.

Florida courts will enforce a choice of law provision "so long as there is a reasonable relationship between the contract and the state whose law is selected and the selected law does not conflict with Florida law or confer an advantage on a

15

non-resident party which a Florida resident does not have." (Citation omitted.) *Forzley v. AVCO Corp. Electronics Div.*, 826 F.2d 974, 979 (II) (11th Cir. 1987). See also *Southeast Floating Docks v. Auto-Owners Ins. Co.*, 82 So.3d 73, 80 (Fla. 2012) (under Florida law, a choice of law provision will be enforced "unless applying the chosen forum's law would contravene a strong public policy of [Florida]") (citation omitted). Here, the evidence shows that Obor Holding is a Florida Corporation that does business in Florida, among other places. Moreover, given that the choice of law provision calls for the application of Florida law, it will present no conflicts of law or public policy issues for a Florida court. In light of these facts, therefore, we must conclude that a Florida court would honor the choice of law provision in the Operating Agreement.

Furthermore, as Obor Holding has conceded in its brief, Florida law would require a court to blue-pencil the restrictive covenants at issue so as to make them enforceable. See F. S. A. §542.335 (1) (c) (requiring courts to modify, rather than invalidate, any restrictive covenants that violate Florida law). Additionally, even if the covenants were blue-penciled to make them comply with Florida law, there is a strong likelihood that they would still violate Georgia law. When modifying overly-broad restrictive covenants, Florida law allows a court to consider only the legitimate

16

business interests of the party seeking to enforce the covenant. Id.; it cannot consider the impact of the restraint on the party against whom enforcement is sought, a necessary requirement in Georgia. See F. S. A. §542.335 (1) (g) (1) (in determining the enforceability of a restrictive covenant, a court "[s]hall not consider" any hardship, economic or otherwise, that "might be caused to the person against whom enforcement is sought.") Compare *W.R. Grace & Co.*, 262 Ga. at 466 (2) ("[i]n determining reasonableness [of a restrictive covenant], consideration must be given to the employee's right to earn a living") (citation omitted). Moreover, a Florida court likely would enforce that part of the nonsolicitation clause which prohibits Carson from accepting business from clients or prospects of Obor Holding, even when the clients or prospects initiate the contact. See *Hilb Rogal & Hobbs of Florida v. Grimmel*, 48 So.3d 957, 961 (Fla. Ct. App. 4th 2010) (enforcing a non-solicitation covenant that barred former employee from accepting business from clients of his former employer, even where he had done nothing to solicit that business). Finally, it is also likely that a Florida court would find the non-compete clause enforceable even though it prohibits Carson from working for a competitor in any capacity and despite the fact that it contains no territorial restriction. See *Gold Coast Media v. Meltzer*, 751 So.2d 645-646 (Fla. Ct. App. 3d 1999) (finding valid a non-compete

17

clause that prohibited a former employee from working in any capacity for a "business in competition, directly or indirectly," with the former employer, anywhere in the United States or Puerto Rico).

As the foregoing analysis demonstrates, it is likely that a Florida court would enforce the forum selection clause at issue. And were Carson required to challenge the restrictive covenants at issue in a Florida court, applying Florida law, the covenants would almost certainly be upheld, despite the fact that they violate applicable Georgia law. Thus, enforcement of the forum selection clause would likely result in a violation of Georgia's then-existing public policy against certain agreements in partial restraint of trade. Accordingly, we reverse the trial court's order dismissing Carson's complaint.

*Judgment reversed. Miller, P. J., and Ray, J., concur.*